# EXHIBIT THREE

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

PROCEEDINGS BEFORE THE 790TH COUNTY GRAND JURY

------------------------------------------------

| In Re the Investigation of: | ) | |
|---|---|---|
| | ) | |
| Nathaniel Benjamin Llanes | ) | No. CR2020-139581-001 |
| Suvarna Ratnam | ) | CR2020-139581-002 |
| Brenda Guadalupe Diaz | ) | CR2020-139581-003 |
| Nathan Jon Aderholdt | ) | CR2020-139581-004 |
| Ryder Collins | ) | CR2020-139581-005 |
| Riley Morgan Behrens | ) | CR2020-139581-006 |
| Christopher Charles Roberson | ) | CR2020-139581-007 |
| Kalixta Noemi Villasaez | ) | CR2020-139581-008 |
| Britney Erica Austin | ) | CR2020-139581-009 |
| Jessica Gibson | ) | CR2020-139581-010 |
| Marysa E. Leyva | ) | CR2020-139581-011 |
| Dominic Berlage Bonelli | ) | CR2020-139581-012 |
| Kaleb Isaiah Martin | ) | CR2020-139581-013 |
| Jacquelyn Alexiz Alcaraz | ) | CR2020-139581-014 |
| Amy Beth Kaper | ) | CR2020-139581-015 |
| | ) | 790 GJ 164 |

------------------------------------------------

Phoenix, Arizona

October 27, 2020

REPORTER'S TRANSCRIPT OF PROCEEDINGS

ORIGINAL
GJ

Prepared By:

Brigid M. Donovan, RPR, CCR
Arizona Certificate No. 50902
602.506.0257
donovanb@superiorcourt.maricopa.gov

2020 NOV 30  PM 3: 57
CLERK OF THE
SUPERIOR COURT
FILED
DEP

A P P E A R A N C E S:

DEPUTY COUNTY ATTORNEY:

        Mike Baker

        April Sponsel

        Andrea Prigmore

GRAND JURORS:



--oOo--

PROCEEDINGS

1
2          MR. BAKER:  This is 790 GJ 164.  The time
3    9:09 a.m.  This is the investigation of 15 individuals.
4    They are as follows, the first is Nathaniel Benjamin
5    Llanes; the second is Suvarna Ratnam; next is Brenda
6    Guadalupe, G-U-A-D-A-L-U-P-E, Diaz; the fourth is Nathan
7    Jon, J-O-N, Aderholdt; next is Ryder Collins; next is
8    Riley Morgan, M-O-R-G-A-N, Behrens; next individual is
9    Christopher Charles, C-H-A-R-L-E-S, Roberson; next
10   individual is Kalixta Noemi, N-O-E-M-I, Villasaez; next
11   Britney Erica, E-R-I-C-A, Austin; next individual Jessica
12   Gibson; next is Marysa E. Leyva; next is Dominic Berlage,
13   B-E-R-L-A-G-E, Bonelli; next individual is Kaleb Isiah,
14   I-S-I-A-H, Martin; next person Jacquelyn Alexiz,
15   A-L-E-X-I-Z, Alcaraz, and finally the last individual is
16   Amy Beth, B-E-T-H, Kaper.
17          This investigation involves five alleged
18   matters.  The first is riot, second is obstructing a
19   highway or other public thoroughfare, the third is
20   unlawful assembly, the fourth is conspiracy to commit
21   aggravated assault, the fifth is assisting a criminal
22   street gang.  And, oh, I've left out the sixth one.  The
23   sixth one is resisting arrest.  There is actually six
24   matters.  Anyone need any of that introductory
25   information repeated?

Brigid M. Donovan, RPR
AZ CR. 50902

1    GRAND JUROR ████: The charges, please.

2        MR. BAKER: One is riot, two is obstructing

3    a highway or other public thoroughfare, three is unlawful

4    assembly, four is conspiracy to commit aggravated

5    assault, five is assisting a criminal street gang, and

6    then sixth is resisting arrest.

7        It's alleged that all these events occurred

8    on October 17, 2020. I am going to guess we are down in

9    the vicinity of Washington and 7th avenue, is that

10   correct?

11       MS. SPONSEL: That is correct.

12       MR. BAKER: Phoenix, Maricopa County,

13   Arizona.

14       I would advise members of the grand jury

15   that the first five of these matters are alleged as to

16   all 15 individuals. The sixth matter, the resisting

17   arrest is alleged as to Mr. Aderholdt only. The first

18   five is as to all 15. The sixth is to Mr. Aderholdt

19   only.

20       To assist you in determining whether or not

21   probable cause exists in the matter, the following

22   statutes may be appropriate: A.R.S. 13-105 --

23       MS. SPONSEL: Mike, you have a question.

24       GRAND JUROR ████: Can you say the first

25   and last name because there is so many.

1          MR. BAKER:  I can say them again; I can
2    spell them again.
3          GRAND JUROR ▓▓▓▓▓:  No, just for that one
4    Ader --
5          MR. BAKER:  His name, Nathan, N-A-T-H-A-N,
6    Jon, J-O-N, Aderholdt, A-D-E-R-H-O-L-D-T.
7          Anyone need any of the other names repeated
8    or spelled associated with allegations?
9          GRAND JURY PANEL:  (No response.)
10         MR. BAKER:  I take it by your silence that
11   there are none.
12         To assist you in determining whether or not
13   probable cause exists in the matter, the following
14   statutes may be appropriate: A.R.S. 13-105; 301 through
15   304 inclusive, those are the accomplice statutes; 1001
16   which is the attempt statute; 1003 which is the
17   conspiracy statute; 1203, 1204 for aggravated assault;
18   2508 for resisting arrest; for riot 2901 and 2903;
19   unlawful assembly is 2902; obstructing a highway or other
20   public thoroughfare, 2906; and then we also have 2301 and
21   2512 that would be for an allegation having to do with
22   hindering prosecution which is relevant to the charge of
23   assisting a criminal street gang.
24         According to Maricopa County Attorney
25   records, the following statutes were read to the members

1  of the grand jury, with all members present, on October

2  6, 2020.  These have already been read:  105; 301 through

3  304 inclusive; 1001; 1003; 1203; 1204; 2508; 2301; and

4  2512.

5            According to our records, the following

6  statute haves not yet been read to the grand jury:

7  13-2901, 2902, 2903, and 2906.  So you probably know what

8  happens now.

9            Since you haven't had these statutes yet, I

10  will be passing out each of them to each of you, and then

11  I will be reading them.

12            13-2901 is, as you've probably guessed by

13  now, definitions for Chapter 29.  In this chapter, unless

14  the context otherwise requires:

15            1.  Quote, marijuana, unquote, means all

16  parts of any plant of the genus cannabis from which the

17  resin has not been extracted, whether growing or not, and

18  the seeds of such plant.  Marijuana does not include the

19  mature stalks of such plant or the sterilized seed of

20  such plant which is incapable of germination.

21            It's interesting to know it's not relevant

22  to this investigation.  The next one is.

23            2.  Quote, public, unquote, means affecting

24  or likely to affect a substantial group of persons.

25            Moving on to 13-2902.  Unlawful assembly;

1   classification.

2              A.   A person commits unlawful assembly by:

3              1.   Assembling with two or more other

4   persons with the intent to engage in conduct constituting

5   a riot as defined in section 13-2903; or.

6              2.   Being present at an assembly of two or

7   more other persons who are engaged in or who have the

8   readily apparently intent to engage in conduct

9   constituting a riot as defined in section 13-2903 and

10   knowingly remaining there and refusing to obey an

11   official order to disburse.

12              B.   Unlawful assembly is a Class 1

13   misdemeanor.

14              Moving on to 13-2903.   Riot;

15   classification.

16              A.   A person commits riot if, with two or

17   more other persons acting together, such person

18   recklessly uses force or violence or threatens to use

19   force or violence if such threat is accompanied by

20   immediate power of execution which disturbs the public

21   peace.

22              B.   Riot is a Class 5 felony.

23              And finally this morning for this

24   presentation 13-2906.   Obstructing a highway or other

25   public thoroughfare; classification; definition.

1         A.   A person commits obstructing a highway

2  or other public thoroughfare if the person, alone or with

3  other persons, does any of the following:

4         1.   Having no legal privilege to do so,

5  recklessly interferes with the passage of any highway or

6  public thoroughfare by creating an unreasonable

7  inconvenience or hazard.

8         2.   Intentionally activates a pedestrian

9  signal on a highway or public thoroughfare if the

10  person's reason for activating the signal to not to cross

11  the highway or public thoroughfare but to do both of the

12  following:

13        (a) Stop of passage of traffic on the

14  highway or public thoroughfare.

15        (b) Solicit a driver for a donation or

16  business.

17         3.   After receiving a verbal warning to

18  desist, intentionally interferes with passage on a

19  highway or other public thoroughfare or entrance into a

20  public forum that results in preventing other persons

21  from gaining access to a governmental meeting, a

22  governmental hearing, or political campaign event.

23        B.   Obstructing a highway or other public

24  thoroughfare under subsection A, paragraph three of this

25  section is a Class 1 misdemeanor.   Obstructing a highway

1   or other public thoroughfare under subsection A,

2   paragraph one or two of this section is a Class 3

3   misdemeanor.

4                    C.  For the purposes of this section,

5   quote, public forum, unquote, has the same meaning

6   prescribed in section 13 -- excuse me, section 15-1861.

7                    So having noted A.R.S. 13-105; 301 through

8   304 inclusive; 1001; 1003; 1203; 1204; 2508; 2301; 2512;

9   having read 13-2901, 2902, 2903, and 2906, is there any

10  members of the grand jury who would like to have any of

11  the statutes re-read or clarified at this time?

12                   GRAND JURY PANEL:  (No response.)

13                   MR. BAKER:  I take it by your silence that

14  there are none.

15                   The record should reflect that copies of

16  all statutes previously read to the grand jury as well as

17  the ones read today have been provided for your use

18  during this investigation.

19                   The name of alleged victims in this matter

20  are, let's start with the State of Arizona by and through

21  the City of Phoenix and then let's go to...

22                   MS. SPONSEL:  There is none actually listed

23  in the indictment.

24                   MR. BAKER:  There should be.  Here we go.

25  As to alleged Count 6, Matthew Morgan, M-A-T-T-H-E-W,

1    M-O-R-G-A-N; Mario Lozoya, M-A-R-I-O, L-O-Z-O-Y-A;

2    Joseph, J-O-S-E-P-H, Kapla, K-A-P-L-A.

3                   Do you have any other potential victims you

4    want me to mention?

5                   MS. SPONSEL:  Yeah, I can go ahead and

6    mention them.

7                   MR. BAKER:  Go ahead.

8                   MS. SPONSEL:  These are all Phoenix

9    officers, Officer William Gates; Sergeant Douglas

10   McBride; Lieutenant Benjamin Moore; Officer John Sticea,

11   S-T-I-C-E-A; Officer Jeffrey Tucker; Officer Christopher

12   Teriano, T-E-R-I-A-N-O; and Sergeant Eric Zopf, Z-O-P-F.

13                  MR. BAKER:  The witnesses who are here to

14   testify today include Jeffrey, J-E-F-F-R-E-Y, Raymond,

15   R-A-Y-M-O-N-D, number 10170 with the Phoenix Police

16   Department as well as Doug, D-O-U-G, McBride,

17   M-C-B-R-I-D-E, number 6187 with the Phoenix Police

18   Department.

19                  The record should reflect the entire grand

20   jury panel is present.

21                  Also present in the grand jury room today

22   are deputy county attorney April Sponsel and Andrea

23   Prigmore both duly authorized by Arizona state law to

24   present evidence before this grand jury panel.

25                  Ladies and gentlemen, the subject matter of

1    this investigation may have received some attention and

2    exposure in the news media.   At this time Ms. Sponsel

3    will give you a brief summary of the investigation.

4                MS. SPONSEL:   Back on October 17, 2020, at

5    approximately 7:00 p.m. in the evening, several

6    individuals with an organization known as ACAB, also

7    known as All Cops Are Bastards, met down in downtown

8    Phoenix in order to participate in a riot.   These

9    individuals entered into the streets with umbrellas that

10   shielded them from the police officers.   They then turned

11   around and threw smoke bombs at the police officers.

12   They then eventually were arrested after throwing

13   barricades and things of that nature into the streets.

14   They disabled one of the police Tahoes when they threw

15   the barricades out into the streets.   And then they

16   were -- when they were eventually arrested, one officer

17   in particular along with other officers were assaulted by

18   the individuals because as one of their techniques that

19   the individuals, this group uses, they use their hands to

20   dig their nails into the hands and arms of the police

21   officers to try and get them not to effectuate arrests.

22                MR. BAKER:   Is there anyone on the grand

23   jury who has read, heard, or seen anything in the news

24   media regarding this investigation?

25                GRAND JURY PANEL:   (No response.)

1      MR. BAKER:  I take it by your silence that
2  there are none.
3      I would remind everyone on the grand jury
4  that any decision made by this grand jury in connection
5  with these matters must be based solely upon the evidence
6  presented during this hearing.  If at any time during the
7  course of this investigation you realize you have had
8  media exposure that would in any way affect your ability
9  to sit as a fair and impartial juror, please request to
10 be excused.
11     You are further admonished that the summary
12 of facts you were just given is not evidence and should
13 be disregarded entirely in your determination of whether
14 or not probable cause exists in these matters.
15     Having noted that, let's again note the
16 presence of the entire grand jury.
17     Those admonitions read to you this morning
18 concerning persons disqualified from serving as grand
19 jurors are applicable.  Are there any grand jurors to
20 whom those admonitions apply?
21     GRAND JURY PANEL:  (No response.)
22     MR. BAKER:  I take it by your silence that
23 there are none.
24     GRAND JUROR ███████:  We are about to
25 consider the matter of 790 GJ 164 and the investigation

1    involving individuals named.

2              In connection therewith, it is my duty to

3    state to you that if any member of this grand jury has

4    the state of mind in reference to the above-mentioned

5    matter or to any party interested therein which would

6    prevent the juror from acting impartially and without

7    prejudice to the substantial rights of any party, the

8    juror is directed to retire from the grand jury room at

9    this time.

10             (Whereupon the witness enters the room.)

11

12                   JEFFREY RAYMOND,

13   called as a witness herein, having been first duly sworn,

14         was examined and testified as follows:

15

16             E X A M I N A T I O N

17   BY MS. SPONSEL:

18      Q    Good morning, Officer, can please just introduce

19   yourself to the members of the grand jury.

20      A    My name is Jeffrey Raymond.

21      Q    And where do you currently work?

22      A    I work for the Phoenix Police Department in the

23   downtown operations unit.

24      Q    And how long have you been with the Phoenix

25   Police Department?

1    A    Since July 2017.

2    Q    And you state that you had worked down in the

3  downtown operations unit.  What exactly is that unit?

4    A    The downtown operations unit is required -- is

5  responsible for policing, patrolling, and proactive peace

6  keeping in the downtown corridor between 7th Avenue and

7  7th Street approximately Fillmore down to Grant.

8    Q    And as part of your job duties in keeping the

9  peace do you sometimes have to arrest individuals and

10 participate in investigations?

11   A    Yes.

12   Q    Back on October 17, 2020, did you participate in

13 an investigation involving several individuals including

14 Benjamin Llanes, Suvarna Ratnam, and Brenda Diaz along

15 with several other individuals named in this

16 investigation?

17   A    Yes.

18   Q    And did that investigation approximately start

19 at 7:00 p.m.?

20   A    Yes.

21   Q    And the location of where this began, where was

22 that at?

23   A    It was -- it began at University Park which is

24 located on the north side of Van Buren between 10th and

25 12th Avenue in Phoenix, Arizona, Maricopa County.

1    Q   And with regards to this investigation, did you

2 personally participate in this investigation?

3    A   I did.

4    Q   Were there other officers that participated in

5 this investigation?

6    A   Yes.

7    Q   Were there reports relating to this case?

8    A   Multiple reports, yes.

9    Q   Did you have the opportunity to review your

10 report as well as multiple reports for your testimony

11 here in front of the grand jury?

12    A   I did.

13    Q   Can you explain to the grand jurors, just give

14 them an overview of what happened after these individuals

15 met at University Park?

16    A   They assembled at University Park.  Shortly

17 thereafter, as a group, they took Van Buren Street,

18 marched eastbound on Van Buren from approximately 10th

19 Avenue.  When they got to 7th Avenue, they marched in the

20 street southbound.

21    Q   Now when you say that they marched in the

22 street, did they have permission to actually be in the

23 street?

24    A   No.

25    Q   Were there actual vehicles such as just like

1    regular traffic that was in the area?

2        A     Yes.

3        Q     Because these individuals walked out into the

4    middle of the street did that impede the ability of

5    people traveling in their vehicles to travel down that

6    roadway?

7        A     Yes.

8        Q     Go ahead.

9        A     From 7th Avenue and Van Buren they marched

10   southbound.  In route, they tipped over and threw and

11   stacked various road construction signs.  They continued

12   southbound.  Once they got to Washington Street, they

13   continued to march eastbound again in the middle of the

14   street.  As then continued marching eastbound on

15   Washington from 7th Avenue they clustered together,

16   opened numerous umbrellas thus obscuring individuals

17   within the group.

18           While they were clustered and shielded by the

19   umbrellas, they released at least two smoke bombs.  These

20   smoke bombs were deployed by them purposely in an effort

21   to create a visual impediment to the Phoenix Police

22   Department.  It made it more difficult for us to identify

23   individuals.  It also caused undue danger to the

24   motorists and the fully marked Phoenix police vehicles

25   that were trailing the group.  As a result of the smoke

1   bombs, it made it more difficult for us to see, it burned

2   our eyes if we weren't in the cars, and one, at least one

3   of the vehicles, one the fully marked police vehicles

4   inadvertently ran over a construction barricade that they

5   had put in the middle of the street.

6          They continued their march eastbound on

7   Washington Street to Central or thereabouts.  And then

8   from there they marched northbound ignoring numerous

9   commands to get out of the street.  I could hear the

10  commands from both vehicle PAs and our long-range

11  acoustic device.  And my car that I was in was

12  approximately a hundred yards behind the moving group of

13  marchers.  The cars that were giving the commands were

14  closer to the group so they could hear the commands and

15  they were purposely disobeyed.

16     Q    Now, with regard to the commands being given,

17  when you say that the cars were closest to the group,

18  were any of these individuals in the group reacting,

19  turning around reacting to the commands that were being

20  given?

21     A    Yes.

22     Q    What were they doing?

23     A    They were giving the middle finger to the cars

24  giving the commands and yelling various insults back, F

25  the police, things of that nature.

1    Q    And with regards to when you said they were

2    throwing these smoke bombs, were they actually lobbing

3    them directly toward the police cars that were following

4    them?

5    A    They were.

6    Q    And were there actual -- I know that you said

7    there were officers and police cars, but were there also

8    officers on foot following this group?

9    A    Yes.

10    Q    And did that create an issue with regard to

11    their visibility to be able to see the group upon

12    throwing the smoke bombs?

13    A    It did.

14    Q    And the throwing of the smoke bombs, you say

15    that one Tahoe was already disabled, but did that create

16    a risk that other Tahoes could have run into, let's say,

17    maybe other pedestrians on foot or into other cars if

18    they wouldn't have been able to get around the smoke

19    bombs in a quick manner?

20    A    Yes.

21    Q    So you stated they continued to go down and you

22    were talking about the part where they are giving

23    commands and they are turning around and flipping you

24    guys off and things of that nature.  What is happening

25    next?

1    A    They continued northbound disrupting any road

2  construction signs and barricades, continued north until

3  they got to Van Buren Street.  From Van Buren Street,

4  Lieutenant Moore, the commanding officer on scene, heard

5  them say, heard at least one person in the group of

6  marchers say, they exclaimed, let's take the tracks.  And

7  it was at that time that Lieutenant Moore also observed a

8  southbound train, light rail, that was north of Van

9  Buren.  So their intention was to take the tracks and

10  disallow that southbound right rail from continuing

11  southbound at Van Buren.  This took place at

12  approximately 8:35 p.m.

13       At that point, Lieutenant Moore said everybody

14  is now good for arrest, they've obstructed every street

15  that they've been on, move in, take them into custody.

16  By 8:40 p.m. Lieutenant Moore declared code four, all

17  members of the marching group were in custody safely and

18  uninjured.

19    Q    And that's what happened there at Van Buren

20  area?

21    A    Van Buren and -- yes.

22    Q    I am sorry, Van Buren and what was the cross

23  street?

24    A    Central.

25    Q    So Central and Van Buren, that's where all the

1  individuals were taken into custody?

2      A    Yes.  Or could have been Van Buren and 1st

3  Avenue between Central and 1st Avenue.

4      Q    And did you participate in these arrests?

5      A    I did.

6      Q    And when you said that Lieutenant Moore

7  eventually put out over the radio that everybody went

8  into custody, did the individuals give up right away?

9      A    They did not.  They clustered together in one

10 big group interlocking both legs and arms making it more

11 difficult to take them into custody.

12     Q    And did you guys have to continue to give them

13 commands when that was all going on?

14     A    Yes.

15     Q    And now, were there several videos that were --

16 I am sorry, were there body cams and other video systems

17 that were videotaping this group while a lot of this was

18 going on?

19     A    Yes.

20     Q    And we are going to talk to Sergeant McBride

21 when he gets in here to testify, but just some

22 clarification questions for you.  With regards to these

23 individuals, did officers actually have the opportunity

24 to sit down and speak specifically to two of the

25 individuals about what was going on?

1      A      Yes.

2      Q      And one of those individuals being Ryder

3  Collins.  Did officers have the opportunity to read him

4  Miranda?

5      A      Yes.

6      Q      And did he agree to talk to you about what was

7  going on that night?

8      A      Yes.

9      Q      And what their plans were?

10     A      Yes.

11     Q      Did he state that he was following the group

12 downtown in order to take photographs of them as well as

13 the police?

14     A      Yes.

15     Q      And did he also state that he did in fact hear

16 the announcements that were been given by officers but

17 that he apologized for not leaving and following the

18 lawful order when told to do so?

19     A      Yes.

20     Q      Did he also state he was moving around the group

21 as well as officers while the protest was on going so he

22 could get photographs?

23     A      Yes.

24     Q      Now, when officers converged on the group before

25 they -- you said that they yelled out take the tracks.

1  What exactly does that mean to you, take the tracks?

2      A    To me it means that they were going to impede

3  southbound trains, southbound light rails.  On that

4  particular stretch of railroad track it is exclusively

5  southbound.

6      Q    And with regards to Ryder Collins, when officers

7  were trying to get handle on the entire group, did he

8  actually run up on officers and try to impede their

9  ability to be able to take these individuals under arrest

10 by running up on the officers trying to distract them?

11     A    Yes.

12     Q    And did officers have to give him several

13 commands to move back?

14     A    Yes.

15     Q    And with regards to Riley Behrens, did officers

16 have the opportunity to sit down and speak to this

17 individual?

18     A    Yes.

19     Q    Was Riley read Miranda?

20     A    Yes.

21     Q    Did Riley agree to speak to officers?

22     A    Yes.

23     Q    Did Riley make several different statements that

24 they were planning on trying to disrupt the downtown area

25 as well as target police officers by using smoke bombs?

1    A    Yes.

2    Q    Did she specifically state that Suvarna Ratnam

3  got the smoke bombs and brought them in order to try to

4  either harm the police or to try to get the police not to

5  follow them any further?

6    A    Yes.

7    Q    And with regards to Riley, did Riley also state

8  that the umbrellas were being used to block cameras and

9  things of that nature?

10   A    Yes.

11   Q    Were there several -- were there actually a

12 couple of individuals or at least one individual that had

13 a gun on them?

14   A    Yes.

15   Q    And who was that?

16   A    Suvarna Ratnam.

17   Q    So what about Britney?

18   A    Yes.

19   Q    There is another individual by the name of

20 Britney -- hold on one second.  Did Britney have a slung

21 AR15 rifle?

22   A    Yes.

23   Q    And did Riley state that the reason why they had

24 guns is as a show of force?

25   A    Yes.

1    Q    And with regards to the smoke bombs, did Riley

2    specifically state that, again, their intention was to

3    create a diversion so officers couldn't drive through it

4    so they couldn't see to drive through it?

5    A    Yes.

6    Q    I don't believe I have any further factual

7    questions for this officer.

8         MR. BAKER:   Do any members of the grand

9    jury have questions for this witness?  Keep in mind he

10   will remain outside after the testimony of the next

11   witness.  So if you think of anything in the interim we

12   can bring him back in.  Does anyone have any questions

13   for him now?

14         GRAND JUROR ████████:  Was Mr. Collins --

15   you mentioned he was taking photographs, was he working

16   in a professional capacity for anyone?

17         THE WITNESS:   Not to my knowledge, no.

18   Q    (By Ms. Sponsel) And just to follow up to that

19   question, good question.  With regards to Ryder Collins,

20   the grand juror just asked if he was working in a

21   professional capacity.  Have you guys had actual members

22   of the news media down at these protests slash riots?

23   A    Yes.

24   Q    And what are they required to wear in order for

25   you guys to know that, hey, this is actually a news

 1    person?

 2        A    Placard, an ID placard.

 3        Q    And do they wear it to where it's very visible

 4    for you guys to know, hey, that's the news media?

 5        A    Yes.

 6        Q    And was Ryder Collins wearing anything like

 7    that?

 8        A    No.

 9                 GRAND JUROR ▮▮▮▮:  Did Mr. Collins have

10    equipment to take photographs with?

11                 THE WITNESS:  He had a camera.

12                 GRAND JUROR ▮▮▮▮:  Do we know if

13    Mr. Collins is part of that group?

14                 THE WITNESS:  It is our contention that he

15    was a part of that group.

16                 GRAND JUROR ▮▮▮▮:  What time again was

17    the code four called out?

18                 THE WITNESS:  Code four was called out at

19    approximately 2040 hours 8:40 p.m.

20        Q    (By Ms. Sponsel) Just to follow up, what is code

21    four?

22                 GRAND JUROR ▮▮▮▮:  Everybody was

23    arrested.

24                 MS. SPONSEL:  No, that's fine.  I was

25    asking him, sorry.

```
 1      Q    (By Ms. Sponsel) Officer, what is code four to

 2  you?

 3      A    To be clear, code four is radio verbiage for

 4  everything is fine and under control.

 5           MS. SPONSEL:  Any other factual questions

 6  for this witness?

 7           GRAND JUROR ████████   Were the guns that

 8  they had, were they registered to those individuals that

 9  possessed them?

10           MR. BAKER:  Officer, are you aware of the

11  fact there is no gun registration in Arizona?

12           THE WITNESS:  I am.

13           MR. BAKER:  Therefore, guns cannot be

14  registered in Arizona.

15           MS. SPONSEL:  Any other further factual

16  questions for this officer?

17           GRAND JURY PANEL:  (No response.)

18           MR. BAKER:  There being no further factual

19  questions at this time.

20           You are admonished that Arizona law

21  prohibits you from discussing your testimony here today

22  with anybody other than the prosecution.

23           If you don't mind having a seat back

24  outside for a moment.

25           (Whereupon the witness enters the room.)
```

1

2                    DOUG MCBRIDE,

3    called as a witness herein, having been first duly sworn,

4            was examined and testified as follows:

5

6                    E X A M I N A T I O N

7    BY MS. SPONSEL:

8        Q    Good afternoon, Sergeant, can you please just

9    introduce yourself to the members of the grand jury.

10       A    I am Doug McBride.  I am a sergeant with

11   Phoenix.

12       Q    And how long have you been with the Phoenix

13   Police Department?

14       A    26 years.

15       Q    And as an officer with Phoenix Police

16   Department, in that 26 years have you had several

17   different assignments?

18       A    I have.

19       Q    And what is your current assignment?

20       A    Currently I am the downtown operations training

21   sergeant.  And I work all the civil unrests in the city

22   as well as take care of the training for that civil

23   unrest.

24       Q    And prior to -- how long have you been assigned

25   in that particular local?

1      A      Just coming up on four years.

2      Q      And prior to that where were you assigned?

3      A      Prior to that I was a FAP, fugitive

4   apprehension, sergeant for almost ten years.

5      Q      And what do those individuals do?

6      A      Basically, I ran a squad that looks for people

7   who have probable cause for their arrest, violent

8   offenders, and they have warrants for their arrest.

9   Service of search warrants and apprehension is our

10  primary focus.

11     Q      And prior to that where were you assigned?

12     A      Prior to that, I was in the Maryvale precinct as

13  a field training sergeant.

14     Q      And prior to that where were you at?

15     A      Prior to that I was a new sergeant in Maryvale

16  on third shift.

17     Q      At some point were you signed to the --

18     A      Been going a long time, yes.  I was a gang

19  detective.  So I was a gang detective for five years

20  prior to promoting to sergeant.

21     Q      How does one become a gang detective?

22     A      Gang detectives are a specialty position within

23  the City of Phoenix.  You have to show knowledge and

24  experience in dealing with gang members.  I was lucky to

25  be assigned to the South Mountain Precinct where there

1    was a plethora of gang members to interact with.   Based

2    on my information and my experience, I was recruited to

3    help with several large investigations of home invasion,

4    rip crews, and stuff like that in south Phoenix.   That

5    led to me actually testing for the gang unit and getting

6    selected to join the gang unit back in 2000, I believe.

7        Q    With regards to being a gang detective and

8    working in that capacity, did you have the opportunity to

9    become very familiar with the Arizona Revised Statutes

10   and the definition that sets out what a criminal street

11   gang is in Arizona?

12       A    I did.

13       Q    And with regards to that definition, do you also

14   have to be familiar with another definition that sets out

15   criteria in order for you to be able to document somebody

16   as a criminal street gang member?

17       A    Yes.

18       Q    And even though you are no longer assigned to

19   gangs do you continue to know those statutes and apply

20   those statutes when needed and necessary in different

21   investigations?

22       A    Absolutely.

23       Q    Now, with regards to an investigation that

24   occurred back on October 17 of 2020 which we are here for

25   today, are you familiar with this investigation?

1    A    I am.

2    Q    This investigation involved approximately 17

3  individuals or 18 individuals, but we are here on 15 of

4  those individuals including Benjamin Llanes, Suvarna

5  Ratnam, and others?

6    A    Yes.

7    Q    And you are familiar with this investigation?

8    A    I am.

9    Q    Did you participate in this investigation?

10   A    I did.

11   Q    Did you write reports relating to this

12  investigation?

13   A    I did.

14   Q    And are you familiar with those reports for your

15  testimony here today in front of the grand jury?

16   A    I am.

17   Q    Now prior to October 17, had you had the

18  opportunity to get familiar with some of the individuals

19  that are listed here in this investigation?

20   A    I did.

21   Q    How did you become familiar with those

22  individuals?

23   A    Through several arrests and violent crimes that

24  were committed, we had contact with several of the

25  members on a prior occasion with prior civil unrests.

1    Q    And have you had the opportunity because of your

2    involvement in this investigation to make a determination

3    as to whether or not these individuals meet the

4    definition of being a criminal street gang under Arizona

5    Revised Statutes?

6    A    I did.  And they do.

7    Q    Let's go ahead and talk about that.  What is the

8    that name of this gang?

9    A    It is called ACAB, A-C-A-B, and it stands for

10   All Cops Are Bastards.  We first came into contact with

11   this group through graffiti, signage, ACAB written on the

12   back of skateboards and different paraphernalia

13   throughout our 150-plus day deployment and mobilization

14   and civil unrest in Phoenix.

15   Q    And as part of your taking a look at whether or

16   not these individuals met the definition of a criminal

17   street gang, I want to talk to you about what you guys

18   have to or what has to be shown.  Does under Arizona

19   Revised Statute does it state a criminal street gang

20   means an ongoing formal or informal association of

21   persons in which members or associates individually or

22   collectively engage in the commission, attempted

23   commission, facilitation, or solicitation of any felony

24   act and that has at least one individual who is a

25   criminal street gang member.  You are familiar with that

1  definition we talked about?

2      A    I am.

3      Q    And with regards to this A-C-A-B or ACAB group,

4  do they have one individual who is at least a documented

5  member of this organization?

6      A    Yes, they do.

7      Q    And when we talk about whether or not somebody

8  can be documented as a criminal street gang member do you

9  have to take into consideration, again, the statute that

10  lays out what the requirements that you guys have to look

11  for?

12      A    Absolutely.

13      Q    Those requirements being one of the seven

14  criteria either, A, self proclamation; B, witness

15  testimony or official statement; C, written or electronic

16  correspondence; D, paraphernalia or photographs; E,

17  tattoos; F, clothing or colors; and, G any other indicia

18  of street gang membership?

19      A    Correct.

20      Q    Can you give the grand jurors through your

21  training and experience an example of what other indicia

22  mean under the law?

23      A    Other indicia can be, as I stated earlier,

24  signage.  It can be chants that they do.  In this case,

25  chants walking down the street.  It could be they decide

```
 1    to paint on the side of their car ACAB.  Different things

 2    that aren't necessarily covered in the other six criteria

 3    can be covered in the other if it directly relates to the

 4    organization and the gang itself.

 5         Q    And with regards to other indicia, how about

 6    just hanging out with each other, with other members, can

 7    that also be considered indicia?

 8         A    Absolutely.  Under the gang statute, just

 9    hanging around and participating can also be an other

10    indication of formal or informal association.

11         Q    And through your investigation, were you able to

12    document all of these members with meeting at least two

13    of the criteria set out under the Arizona Revised

14    Statutes?

15         A    I was.

16         Q    I want to talk to you specifically about some of

17    the individuals, the main individuals.  Were you able to

18    identify one of the main individuals in this group?

19         A    I was.

20         Q    And who was that?

21         A    Suvarna Ratnam?

22         Q    And with regards to applying the gang statute to

23    her, what of the seven criteria were you able to find

24    that she in fact meets?

25         A    She was able to actually to meet five of the
```

1    seven criteria.  So she has put a tattoo on her wrist

2    that actually says A-C-A-B or ACAB.  She was dressed in

3    the black block clothing which is a description for all

4    black clothing over the outside of other clothing that

5    actually concealed not only your identity but your sex as

6    well.  She also is a -- she self proclaimed part of ACAB.

7    She also has written some written correspondence through

8    some messaging apps where she also wrote about ACAB and

9    the organization itself.  There was one more.  So four

10   out of the seven.

11        Q    So and the other individuals that have been

12   listed in this indictment, did you find they met at least

13   two of the criteria?

14        A    I did.

15        Q    And what were those other two criteria where you

16   were able to attribute the other individuals listed in

17   the indictment?

18        A    Both self proclamation and the colors, the

19   clothing.

20        Q    And through your training and experience of

21   dealing with this ACAB group what exactly color -- what

22   color do they claim?

23        A    Black.

24        Q    And you stated these guys are known to walk down

25   the street and start chanting out ACAB.  Is that a way

1   for them to self identify with this criminal street gang?

2      A    Yes.

3      Q    Now, Detective, in your training and experience

4   with regards to this particular gang versus, let's say,

5   the Bloods and the Crips, are you familiar with those

6   types of criminal street gangs, the Bloods and the Crips?

7      A    Very much.

8      Q    And with regards to your training and

9   experience, the Bloods, do they have a specific color

10  they claim?

11     A    Yes.

12     Q    What color is that?

13     A    Red.

14     Q    Do they tattoo themselves in furtherance of

15  their gang to show their loyalty?

16     A    Yes, they do.

17     Q    What kind of things, what kind of tattoos do

18  they get?

19     A    They can do any moniker of their actual Blood

20  set.  So if they are a 79 Swan, they can get 79 Swan put

21  on there.  A lot of times they'll put their street where

22  they live as part of their neighborhood.  A lot of times

23  Bloods will also put the letters CK which means crip

24  killer because that's their main rival.  And they'll also

25  do, they can do numbers as well to correlate with letters

1  of the alphabet.   So one being A, two being B, that kind

2  of stuff they'll put on their body to identify themselves

3  as well.

4      Q     And are you finding that ACAB is following the

5  exact same type of philosophy of let's say Bloods and the

6  Crips?

7      A     Yes.

8      Q     And what about even maybe the same philosophy as

9  the Hells Angels?

10     A     Very similar, yes.

11     Q     And why would that be similar?

12     A     I think because the tattoos, the intimidation

13 factor, how they are directing their violent behavior,

14 and they're organizing their violent behavior very

15 similar to the Hells Angel organization where they

16 actually organize their violent behavior, and then they

17 carry that out in very organized fashion.   It's not

18 random with the Hells Angels.

19     Q     And are you finding that's exactly what this

20 ACAB group is doing is they are organizing for the intent

21 to create violence?

22     A     Yes.

23     Q     Now, in your training and experience, because I

24 know you talks about, you know, the Bloods and we brought

25 up the Crips and stuff like that, do you find that

1  whether or not there is a difference between ACAB and

2  let's say the Bloods and the Crips?

3      A    Yes, I do find very large difference actually.

4      Q    And what is that difference?

5      A    This is the first time in my experience or in

6  Phoenix PD's experience that we have an organized group

7  of individuals and all of their planning and all of their

8  violence is directed directly toward the police

9  department.  We've never had that before.  With Bloods in

10  the Crips, where there will be interactions with police

11  based on their behavior and their criminal behavior, they

12  are not physically organizing or practicing or teaching

13  each other to be violent against police.

14          This group is specifically setting out

15  almost on a weekly basis to disrupt police, commit

16  violent acts of aggravated assault against police, throw

17  incendiary devices at police.  And they are talking about

18  it, they are buying the equipment, they are bringing it

19  to the gathering, and executing those plans.

20      Q    And in fact, after these individuals, some of

21  these individuals were taken into custody, did you guys

22  find other weapons on them such as bricks and rocks?

23      A    Yes, we did.

24      Q    And why would that even be relevant?  I guess, I

25  could carry a brick or rock in my bag.  Why is it

1    relevant with regards to this particular group?

2        A    Because those are the items that have been

3    thrown at us directly.  Officers have been struck with

4    rocks, bricks, water bottles, ice bottles, a plethora --

5    anything that they can pick up and throw we've been hit

6    with.

7        Q    And what about the umbrella, is that part of

8    their, I guess you could say their gang uniform?

9        A    It is.  It's an extension of what they are doing

10   to disrupt us and to try and defeat our tactics which are

11   pepper stray and different kinds of nonlethal munitions.

12   The umbrella will provide a protective umbrella around

13   them, to use the umbrella word, and then it will also

14   conceal what they are doing.  As this group moved on

15   October 17th, they were able to conceal what each person

16   was doing by draping umbrellas around the exterior of the

17   group so we couldn't see inside.

18       Q    And in the past has this group, just in general,

19   have they actually used the umbrellas as a weapon?

20       A    Yes.  So on a prior occasion, the Suvarna

21   Ratnam, who I discussed earlier, she actually utilized

22   her umbrella to stab an officer in the hand causing a cut

23   on his hand.

24       Q    And are you guys finding that watching the

25   national trends across the country that these are tactics

1   that are being deployed by those groups that are just

2   focusing in on violence?

3       A    Yes.

4       Q    In your training and experience of working

5   criminal street gangs, do you have an opinion as to

6   whether or not ACAB is in fact a documented -- excuse me,

7   is a street gang here under the Arizona Revised Statutes?

8       A    They absolutely meet every single part of the

9   statute.

10      Q    And with regards to working in the downtown

11  operations unit working protests versus riots, what's the

12  different between a peaceful protest under the 1st

13  amendment versus what we have here in this case?

14      A    A peaceful protest is just like the 1st

15  amendment says:  The right to peacefully assemble.  That

16  means we are not breaking laws, we're not interfering

17  with other people's right, we're not shutting down

18  government operations and/or main arteries that feed the

19  downtown area specifically.  Peaceful protests were not

20  engaging police.  We are not assaulting police.  We are

21  not throwing projectiles at police.  People typically in

22  a peaceful protest are not covering their identity.  They

23  are not trying to hide their -- what they are doing.

24  They maintain staying on the sidewalk following all

25  applicable laws and letting their message be heard.  And

1  we have hundreds if not thousands of those every year

2  with no issue.

3      Q    And with this particular group, are you guys

4  giving them commands pretty much basically from the very

5  beginning that they stepped into the street when they

6  started to impede traffic?

7      A    Yes.

8      Q    Now, I know that I've asked previously but I am

9  going to ask you:  These things, were they captured on

10  body worn camera as well as surveillance video that you

11  guys utilize?

12     A    Yes.

13     Q    And did you have the Phoenix Police Department

14  put together several different clips using the

15  surveillance video as well as the body cam video in order

16  to help aid the understanding of what exactly was going

17  on during the riot back on October 17, 2020?

18     A    Yes.

19     Q    And did you have an opportunity to take a look

20  at the video?

21     A    I did reviewed it.

22          MS. SPONSEL:  Do we need to have this

23  marked as Exhibit 1?

24          MR. BAKER:  We can do that.

25     Q    (By Ms. Sponsel) Sergeant, while I am waiting

1  for that to continue to download, with regards to this

2  particular date and the organization, did you find they

3  were very well organized on October 17, 2020?

4      A    I did.

5      Q    And was that based on your previous knowledge

6  or, and/or both maybe of also what you were observing

7  that night and what you guys found on a lot of these

8  individuals?

9      A    I believe it would be both, both prior knowledge

10 and watching what transpired that evening.

11                    (Video playing.)

12     Q    So what is the, what are the grand jurors taking

13 a look at here?

14     A    This is the group of individuals identified on

15 October 17.  They are moving down the center of a major

16 street, I believe that is Van Buren Street which is a

17 very busy major artery in downtown Phoenix.  You see the

18 police car there having to block traffic because we had

19 to divert dozens of vehicles as they took the street

20 over.  Obviously, you can see the use of the umbrella and

21 that black block clothing.  So it's very difficult to

22 make out who is male, female.

23          And then this is actually -- this is going to be

24 Washington Street.  And this is where they threw three

25 incendiary devices.  They burn at about 700 degrees

1    Fahrenheit, can catch a lot of things on fire.  They

2    threw them at the two trailing police vehicles obviously

3    obscuring our view which then enabled them to start

4    taking barricades from the side of the street and placing

5    them in the traffic way to try and disable our vehicles.

6        Q    And did one vehicle actually become disabled?

7        A    Yes.

8        Q    Now, we saw the two Tahoes.  Are there any

9    officers on foot near the Tahoes when the smoke bombs or

10   incendiary devices were thrown?

11       A    Yes, I believe there a few grenadiers, the guys

12   I actually supervise, who have the nonlethal munitions.

13   There was a few of them out on foot in case we needed to

14   address the crowd.

15       Q    And did they have issues seeing around the smoke

16   in order for them to be able to do their job duty?

17       A    Correct.  As soon as that smoke is deployed,

18   it's very difficult to see as you just experienced.

19       Q    With regard to these devices, if these devices

20   hit an officer directly, can it cause burns?

21       A    Yes.

22       Q    Can it cause serious physical injury?

23       A    Yes.

24       Q    And the grenadiers, what exactly is a grenadier?

25       A    We have a certain number, actually about 30

1   individuals in the Phoenix Police Department, who are

2   certified in deploying less lethal munitions things like

3   smoke. We have smoke as well, tear gas. We also have a

4   PepperBall which is like a paint ball with pepper spray

5   in it. We have super sock. It's a stun bag round which

6   is used all throughout the department. And we have

7   noisemakers like aerial bangs and muzzle bangs that just

8   make noise. There is no projectile in those.

9       Q    And with regard to the Phoenix Police Department

10   and policies and procedures and things of that nature, do

11   you guys have to wait for something to happen in order

12   for you to use any of those types of munitions to respond

13   to a crowd?

14       A    Absolutely. We are looking for active

15   aggression and violent behavior before any of that is

16   ever utilized.

17       Q    And do you know, does ACAB have policies and

18   procedures with waiting -- where they have to wait to be

19   able to use their munitions against you guys?

20       A    Not to my knowledge.

21       Q    All right. And so here, they just started

22   throwing these smoke bombs. Were you guys even

23   anywhere -- I mean, you guys were following, but were you

24   guys doing anything to them such as yelling at them,

25   throwing anything at them, hitting them with PepperBalls,

1  or anything like that?

2      A   At this point all we were doing was loud audible

3  messages asking them to get out of the roadway at this

4  point.

5             (Video playing.)

6      Q   Now, it looks like we've switched from, I think

7  it's called strong watch.  It is strong watch video?

8      A   Yes.  It's a camera mounted on the back of a

9  truck and this looks like a body cam here.

10      Q   And is this one of the officers that had to deal

11  with the smoke bombs?

12      A   Yes.

13             (Video playing.)

14      Q   And even at that point were you guys using

15  PepperBalls or anything despite the fact they are

16  throwing these types of things at you guys?

17      A   No.

18      Q   Now, are we going back to the strong watch?

19             (Video playing.)

20      A   Correct.

21      Q   Tell the grand jurors what's happening here.

22      A   As I indicated earlier, they started to take the

23  construction barriers that are there to protect the

24  public from all the open holes and the street work that's

25  being done and they are placing them strategically in the

1   middle of the roadway to disable our vehicles, disrupt

2   our following of the crowd to make sure that they conform

3   to the law.  You'll see the crowd moving in unison.

4   Everybody has a part whether it's holding an umbrella or

5   grabbing a barricade and dragging it out to the street.

6       Q    Now, the Ryder Collins, he's one of the

7   individual listed in the indictment.  And he was going

8   around, and he was taking photographs.  Did you see him

9   join up with the group while you guys were dealing with

10  all this?

11      A    Yes, he was in and around the group throughout

12  the entire night.

13                  (Video playing.)

14      Q    Did it appear as though he was working with

15  concert with them?

16      A    Yes, he did.

17      Q    What's going on here?

18      A    Obviously, we are having to get out and clear

19  the barricades so our vehicles can get through safely

20  which again puts officers in jeopardy out in the middle

21  of the street dealing with these heavy barricades which

22  they put out into the middle of the street.  The

23  grenadier -- that's one of my grenadiers.  He's just

24  covering and helping just so no one gets hurt.

25      Q    Did this allow the group to get even further?

1     A     Yes.  They continued quite a ways in front of us

2     until we get to this point which is the arrest.

3     Q     And why did you guys decide to arrest them at

4     this point?

5     A     They had already thrown the three incendiary

6     devices at us.  They had moved all the barricades.  They

7     disabled a police car.  And right before this moment, my

8     lieutenant actually heard from the group that they were

9     going to take the light rail platform which is a train

10    system downtown.  And there was an actual light rail

11    train southbound on those tracks at that time.  And he

12    felt that that would be extremely dangerous not only to

13    them but to the people on the light rail as well.  It's a

14    high voltage electric train system that works down there,

15    so he did not want to allow that to happen.

16    Q     And we are going to get into, and I think we are

17    going to be able to see some of this further on, but when

18    all this group got to this corner what exactly did they

19    do?

20    A     So what happens here is they actually, we move

21    in to make arrests and tell them to get down.  And the

22    group, basically somebody sets off another incendiary

23    device within the center of the crowd.  You can see it

24    briefly when this first started.  That wasn't us; that

25    was them.  And then they take the umbrella and they

1   completely conceal their identity under there.  And we

2   also -- I didn't mention earlier, but there is one

3   individual that we noticed early on who has an AR15 rifle

4   slung.  So they cover that person up as well so we can't

5   see what they are doing either.

6       Q    And does that create a risk for you guys?

7       A    Absolutely.  It's a huge hazard for us.

8       Q    And even though that person is not pointing the

9   gun at you guys in any way, shape, or form, by the mere

10  fact they are covering it up does that put you guys in

11  apprehension that something could happen?

12      A    Absolutely.

13      Q    All right.  So let's go ahead and -- I am sorry.

14  When they go down to the ground, are they all just laying

15  there separately or do they go down as a group?

16      A    They go down as a group, and they use a specific

17  tactic when they do.  They are trying to prevent

18  themselves or their buddy from being arrested.  And how

19  they do that is they interlock their arms and legs so

20  they are very like chain linked together, if you will,

21  with a human body.  And if you can imagine 18 people,

22  even if we took everyone in this room and linked you guys

23  together it would be very difficult to start to break

24  that chain of group to try and get people into custody.

25  So it creates a huge hazard for officers both physically,

```
 1   I mean just -- I am old, and bending over and trying to
 2   like, you know, pick people up and break them apart and,
 3   you know, it's a hazard.  And we have the umbrellas to
 4   deal too.  So you got to kind of rip those out and get
 5   those out of the way and then make sure they are not
 6   pointing a gun at you and take them into custody.  It's
 7   very much a -- it's a hazardous situation for us.
 8        Q    And did officers -- did some officers including
 9   yourself actually become injured during the arrest?
10        A    Yes.  So it is what it is.  They basically -- so
11   when you -- as I reach down to grab their fingers and
12   hands and pull them apart, they utilize a technique where
13   they -- they actually in some cases sharpen their
14   fingernails.  I don't know if you guys are familiar with
15   that, but they'll actually put points on them, and
16   they'll dig them into the back of our knuckles and hands.
17   My particular thumb got disrupted.  It was cut open and
18   bleeding and still hurts, actually the ligaments in it.
19   They'll do that as well just to prevent us from taking
20   them into custody.
21        Q    Let's go ahead and watch his portion.
22             (Video playing.)
23        A    So this is the arrest.  And it's typical we have
24   guys that are separating the group apart and guys
25   protecting the actual officers that are taking people
```

1   into custody.  We had one individual that tried to climb

2   the fence and throw something at one of the grenadiers,

3   and he had to address him with some PepperBall.  Another

4   grenadier sprayed that same individual with those seed

5   spray (phonetic).  But basically we are dragging them

6   apart.  We are making sure that -- rendering them

7   relatively save, putting handcuffs on them, and getting

8   into vehicles as quickly as we can.

9            (Video playing.)

10       Q    Who is that talking?

11       A    That's my lieutenant.  That's Lieutenant

12  Benjamin Moore of the Phoenix Police Department.  That

13  individual is climbing the fence right there in the

14  background.  You see him up on the fence, and he's

15  actually reaching into the back of his backpack.

16       Q    Is that individual Nathan Aderholdt?

17       A    I believe so, yes.  And that's PepperBall being

18  addressed as he's noncompliant and then the pepper spray.

19       Q    And who is that officer?

20       A    That's Officer Chris Teriano.  He's a grenadier

21  giving very specific instructions.  I don't think -- it's

22  easy to understand, and he refuses to.  Based on his

23  actions he's PepperBalled and sprayed with pepper spray.

24       Q    And are we slowing down his actions here in a

25  little bit?

1    A    Yes.

2    Q    And again that's Nathan?

3    A    Yes.  And that's another angle of him
confronting the officer, not complying with directives.

5    Q    Now, I am going to stop it here for a second
just to clarify.  Now, when you guys -- in order for you
guys to use the PepperBalls, pepper spray, and stuff like
that, do have you to wait for that active aggression?

9    A    Yes.

10    Q    And were you guys, we they were getting ready to
slow it down with regard to Nathan Aderholdt, do you guys
actually see the active aggression other than him just
trying to get up over the fence?

14    A    I don't know if Officer Teriano saw him reaching
into his backpack at the time but his aggressive nature
in trying to get over that fence and not complying.  It's
interesting to note 17 other people complied with the
command to get down on the ground, and this one
individual remained defiant and continued to engage the
officers which is what precipitated the PepperBall.

21    Q    Let's go ahead and --

22         (Video playing.)

23    Q    Is this just slowed down?

24    A    Slowed down, same angle.  They are going to kind
of point it out to you.  He's holding on to the fence

Brigid M. Donovan, RPR
AZ CR. 50902

1   there.   He uses his right hand to go into the back of his

2   backpack, come forward.   See how he comes forward with an

3   object in his hand.   We don't know what that object is.

4   And it ends up on the ground because he drops it.   Just

5   another angle.   He pulls himself up, reaches in the back,

6   and brings an object about.   And that's when Officer

7   Teriano directs his direct impact to him.

8       Q       And you guys don't at that point know if he has

9   a gun or anything like that with that action?

10      A       Correct.

11      Q       Now, what are we taking a look at here?

12      A       That's my -- I believe that's me.

13      Q       And is this the intertwining that you are

14  talking about where they are interlocking themselves?

15      A       Correct.   Yeah, that's mine.   I just pulled an

16  umbrella out, and I am trying to get their hands.   You

17  see they interlock their hands.

18      Q       And is this the way they are hindering your

19  guys' ability to effectuate the arrest for all of these

20  crimes?

21      A       Correct.   You see their legs are intertwined.

22  Their hands are intertwined.   They are just dead weight.

23  And they are, you know, forcing us to utilize a lot of

24  extra energy and effort to get them into custody instead

25  of just self surrendering like most people do.

1      You can see the balance issues just making it as

2  hard as possible.   There is the rifle.   That individual

3  also had a handgun on them as well.   And there is the

4  layers of clothing, extra magazine ammunition, and the

5  Glock.

6      Q    Now, so with regards to these individuals and

7  their organization, I know we've talked about the Bloods

8  and the Crips and things of that nature, have you ever

9  seen the Bloods or the Crips where they are organized

10 like this to where they actually interlock their arms and

11 their legs?

12     A    No.

13     Q    And when we are talking about organizations,

14 would you equate these guys to the better, well-organized

15 criminal street gang such as Hells Angels or Mexican

16 Mafia rather than let's say the Bloods or the Crips?

17     A    Yes.

18     Q    And why would you say that?

19     A    They are just coordinated.   An interaction with

20 a Blood or a Crip is usually happenstance or by their

21 action and police responding to that location.   It's not

22 a purposeful act.   The Bloods and Crips don't sit out at

23 their home and say we are going to go down to

24 headquarters and engage the police in activity.   They

25 just don't do that.   They are going to go commit an armed

1 robbery or homicide, and we are going to come and

2 interact with them.  This is different.  This is a

3 coordinated attack like we've seen from Hells Angels not

4 on police.

5    It's important to note that Hells Angels don't

6 attack police either.  But they'll to that with their

7 rivals like the Mongrels and other motorcycle gangs

8 they'll do coordinating.  I mean, they launched in Canada

9 one time they took a bunch of rocket launchers and

10 launched them at their rival's residences if you will.

11 So they have a very coordinated approach.  They are very

12 organized.  They communicate with their group.  They have

13 a hierarchy of leaders and the subordinates and

14 hang-arounds.  And they have a very distinguished

15 hierarchy which is very similar to this ACAB group.

16  Q And with regards to -- just one more question

17 for you with regard to Nathan Aderholdt, the one that we

18 saw trying to get on the fence and then do that action of

19 pulling that item out.  When officers saw that, Officer

20 Matt Morgan as well as Mario Lozoya and Joseph Kapla, did

21 they go in to effectuate his actual arrest of trying to

22 grab ahold of him and trying to get him into custody?

23  A Yes, they did.

24  Q Was he still flailing around his arms and things

25 of that nature using force against the officers so they

```
 1    couldn't get handcuffs on him quickly?

 2        A    Correct.  He resisted arrest actively.

 3        Q    So did it take three officers to eventually get

 4    him into handcuffs?

 5        A    Yes.

 6             MS. SPONSEL:  I don't believe I have any

 7    further factual questions.

 8             MR. BAKER:  Does anyone have any factual

 9    questions for this witness?

10             GRAND JUROR ████████:  I believe you

11    mentioned that Suvarna Ratnam used an umbrella to strike

12    an officer.  Was that during this occasion?

13             THE WITNESS:  No, that was on a prior

14    occasion.

15             MR. BAKER:  Ladies and gentlemen, I would

16    advise members of the grand jury you may use that only

17    for limited purposes.  You may not conclude merely

18    because somebody may have committed a crime in the past

19    they are more likely to have committed the crimes here.

20    However, you may consider it for identification purposes

21    as to how law enforcement might know her.  And also to

22    give you some notion of what her motivation might be

23    during the course of the matters that are under

24    presentation here.

25             GRAND JUROR DONGELL:  Were there other
```

```
 1   victims?  I thought you had listed victims before the

 2   officers' names.

 3                  MR. BAKER:  That would be the State of

 4   Arizona and City of the Phoenix.  As to the officers,

 5   they are the only ones listed in the draft indictment.

 6                  GRAND JUROR ███████:  It was all officers

 7   that were listed?

 8                  MR. BAKER:  They were listed in the draft

 9   indictment.  Did you have some other people?

10                  MS. SPONSEL:  Yes, those are all Phoenix

11   officers.

12                  GRAND JUROR ███████:  Okay.  No people

13   standing around were victims?

14                  MS. SPONSEL:  No.

15      Q    (By Ms. Sponsel) Were there several civilians

16   from your observations that had their night disrupted

17   because of these individuals?

18      A    Yes.

19                  GRAND JUROR ██████:  The item that Nathan

20   had pulled out of his backpack when he was trying to

21   climb up the fence, was that ever located?  Do we know

22   what it was?

23                  THE WITNESS:  We don't.  It was not located

24   that evening.

25                  MS. SPONSEL:  Any further factual
```

1    questions?

2              GRAND JUROR ▮▮▮▮▮▮▮:  The officers that

3    sustained injury, can you just remind us what was the

4    injuries they sustained?

5              THE WITNESS:  They just cut open the back

6    of my finger.  It's healing, but it's just sore and hurt

7    and bled all over the place.

8         Q    (By Ms. Sponsel) Do you know, were there any

9    other injuries -- from your recollection, do you know did

10   any other officers get any other type of injuries like

11   that?

12        A    I don't believe so.  I don't believe there was

13   anybody else.

14        Q    But the other, the other stuff that was used

15   against the officers, such as the incendiary devices and

16   things of that nature, those things could have harmed

17   those officers to the point that one of them was

18   concerned enough he had to get out of his patrol car to

19   get it out of the way?

20        A    Yes.

21             MR. BAKER:  Any further questions for the

22   sergeant?

23             GRAND JUROR ▮▮▮▮▮:  Is it normal for an

24   officer to go up to something that's smoking like that?

25   I mean, what if it would have blown up on them or

1   something.  He didn't have any protection other than

2   just -- he didn't have nothing.  He just walked up to it?

3               THE WITNESS:  Correct.  What I'll say to

4   that is the grenadiers are highly trained.  So he's one

5   of my top instructors.  So he's pretty good at readily

6   identifying something right out of the gate.  So he

7   felt -- if he felt comfortable doing so.  Obviously, we'd

8   like to dispose of it in the different way, but in the

9   immediacy of the moments he had to push past it to get to

10  the crowd.  He rendered it semi safe by placing it in a

11  place where it wouldn't catch anything on fire so he

12  could move forward.  And then we went back and collected

13  that item later.

14              MS. SPONSEL:  Any other factual questions?

15              GRAND JURY PANEL:  (No response.)

16              MR. BAKER:  I take it by your silence that

17  there are none.

18              You are admonished that Arizona law

19  prohibits you from discussing your testimony here today

20  with anybody other than the prosecution.

21              If you don't mind having a seat back

22  outside for a moment.

23              (Whereupon the witness is excused.)

24              MR. BAKER:  Before we ask for legal

25  questions, we told you the first witness would remain

1  available should you have any further questions for that

2  witness.  Does anyone have any for the first witness?

3  Apparently not.

4           At this point, any legal questions?

5           GRAND JURY PANEL:  (No response.)

6           MR. BAKER:  I take it by your silence that

7  there are none.

8           We'll step outside and allow you to

9  deliberate to determine which of your options you wish to

10  pursue.

11           (Whereupon the deputy county attorney and

12  the court reporter were excused from the grand jury room,

13  were subsequently recalled into the grand jury room, and

14  the following proceedings were had:)

15           GRAND JUROR ████:  The jury has voted and

16  directs the county attorney to prepare a draft indictment

17  for our consideration.

18           MR. BAKER:  The county attorney has

19  prepared a draft indictment for your consideration.

20  Please remember the admonitions read to you this morning

21  with regards to the draft indictment is still applicable.

22           (Whereupon the deputy county attorney and

23  the court reporter were excused from the grand jury room,

24  were subsequently recalled into the grand jury room, and

25  the following proceedings were had:)

1               GRAND JUROR ███████:  The clerk will now

2  read the grand jury's findings.

3               GRAND JUROR ███████:  The grand jury with

4  16 members present and only members of the grand jury

5  present, deliberated upon the evidence, and with 16

6  jurors voting by a vote of 16 to zero, returned a True

7  Bill.

8               MR. BAKER:  That concludes this

9  investigation.

10                        --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R E T U R N    A P P E A R A N C E S:

DEPUTY COUNTY ATTORNEY:

        Mike Baker


GRAND JURORS:

                    --oOo--

```
 1              (Whereupon Judge Steve Hopkins is called

 2     into the courtroom, and the following proceedings were

 3     had:)


 4


 5                  P R O C E E D I N G S

 6                  RETURN OF INDICTMENT

 7              THE COURT:  You may be seated, Ladies and

 8     Gentlemen. This is the 790th Maricopa County Grand Jury.

 9              Deputy County Attorney Mike Baker is

10     present.

11              The standard orders read on October 9,

12     2020, are still in full force and effect.

13              The Foreperson may proceed with today's

14     returns.

15              GRAND JUROR        :  Your Honor, case 790

16     GJ 164, a True Bill.  My signature appears on the

17     indictment endorsing it a True Bill.

18              MR. BAKER:  NSI as to all 15 co-defendants,

19     Your Honor.  In addition, there is an exhibit with that

20     file.

21              THE COURT:  And the exhibit is what?  Oh,

22     it's a video.  All right.  It's ordered that a Notice of

23     Supervening Indictment shall issue with respect to all 15

24     defendants.

25                  --oOo--
```

Brigid M. Donovan, RPR
AZ CR. 50902

C E R T I F I C A T E

I, Brigid M. Donovan, CR, a Certified Reporter in the State of Arizona, do hereby certify that the foregoing pages constitute a full, true, and accurate transcript of the proceedings had in the foregoing matter, all done to the best of my skill and ability.

SIGNED and dated this 17th day of November, 2020.

/s/ *Brigid M. Donovan*

Brigid M. Donovan, RPR

Certified Reporter #50902